# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-0603V**

|  |  |
|---|---|
| JANELLE SIMPSON, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: February 17, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Bridget Candace McCullough, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Jay Travis Williamson, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 12, 2021, Janelle Simpson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"), which she amended on June 8, 2022. Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on September 30, 2019. Amended Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 56, 58, 63). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $60,000.00, plus $4,084.33 for lost wages.

## I.     Factual Evidence

### A.  Medical Records

Petitioner, a nurse, received a flu vaccine in her left deltoid on September 30, 2019 at her place of employment. Ex. 3 at 3. Between October 1 and 5, 2019, she exchanged messages with health care providers about which pneumonia vaccine she should receive and whether she had received a flu vaccine that year. Ex. 4 at 2071-73. Petitioner did not mention arm pain in these messages.

On October 9, 2019, Petitioner received an injection in her lower left arm to treat asthma. Ex. 4 at 2082. This injection took place at an ambulatory infusion center, and it does not appear that Petitioner saw a physician during this visit. She reported feeling well during a pre-procedure check done by phone. *Id*. at 2083-84. The record states that Petitioner's musculoskeletal and various other systems were "Within Defined Limits," with no details as to what, if any, examination was done to reach this conclusion. *Id*. at 2089-90. The record noted impaired hearing and respiratory concerns, without further details. *Id*.

Two weeks after vaccination (October 14, 2019), Petitioner saw Dr. Lauren Edwards for left arm pain and limited range of motion ("ROM") that began "following a flu shot 2 weeks ago." Ex. 4 at 2102. Dr. Edwards assessed her with a possible rotator cuff injury or tendinopathy, and encouraged her to contact occupational health to obtain work restriction approval and a physical therapy ("PT") referral. *Id*. at 2106. The patient instructions portion of the record states, "You most likely had your rotator cuff affected after the flu shot." *Id*. at 2107.

The same day (October 14th), Petitioner reported her injury to her employer's occupational health unit. Ex. 5 at 84. She explained that on September 30th, she received a flu vaccine in her left upper arm a bit higher than was typical, and it "hurt more than usual." *Id*. She thought it was just the usual pain from injection, but two to three days later the pain was still present, so she took ibuprofen daily for ten days. *Id*. She described her pain as aching and rated it as ranging between three and eight out of ten. *Id*. The record of this visit lists the date of injury as September 30th (the date of vaccination). *Id*. Petitioner was assessed with a sprain of the left shoulder joint and trapezius muscle, referred to PT, and placed on modified work restrictions. *Id*.

Two weeks later (October 30, 2019), Petitioner returned to occupational health. Ex. 5 at 88. Because her shoulder pain was worsening, an MRI was ordered, and work restrictions continued. *Id*. An MRI done the following week revealed focal edema suggestive of a moderate teres minor strain and small osteochondral injury of the central glenoid with mild underlying reactive marrow edema. *Id*. at 213.

Petitioner underwent a PT evaluation of her left shoulder on November 7, 2019. Ex. 8 at 7. She reported that following vaccination on September 30th, she had experienced more pain than usual, reporting it to her doctor two weeks later after it had persisted. *Id*. She rated her pain two to three out of ten at rest, up to six out of ten with certain motions. *Id*. On examination, her left shoulder active ROM was 80 degrees in flexion and 70 degrees in abduction. *Id*. Her left shoulder passive ROM was 150 degrees in flexion, 120 degrees in abduction, and 65 degrees in external rotation and internal rotation in neutral. *Id*. She was assessed as having persistent left shoulder pain "with marked ROM restrictions." *Id*.

Petitioner returned to occupational health on November 15, 2019. Ex. 5 at 94. Her shoulder pain had improved, and overall she had improved 60-85%. *Id*. She was advised to continue with PT and work with restrictions. *Id*.

On November 18, 2019, Petitioner saw orthopedist Sunita Hirani, M.D., for treatment of left shoulder pain. Ex. 7 at 25. She reported pain in her left shoulder within two hours of vaccination that worsened. *Id*. at 25-26. On examination, her left shoulder ROM was reduced compared to both her right shoulder and "normal values" used by Dr. Hirani. *Id*. at 28. Dr. Hirani noted that Petitioner's left shoulder pain started after vaccination, and assessed her with left shoulder rotator cuff tendonitis and trapezius strain following flu vaccination on September 30, 2019. *Id*. at 29. Petitioner had seen some improvement with PT, and Dr. Hirani recommended that additional PT be ordered. *Id*. Dr. Hirani noted that a cortisone injection could help, but Petitioner wanted to maximize conservative modalities first and thus was referred for acupuncture. *Id*.

Petitioner returned to occupational health on November 29, 2019. Ex. 5 at 100. Her shoulder pain had improved but recurred, and her ROM had improved. *Id*. Additional PT and continued work restrictions were ordered. *Id*. at 101. Two weeks later (December 13, 2019), her shoulder ROM and pain had improved, but she still had pain with overhead movements. *Id*. at 106. She rated her pain three to four out of ten. *Id*. She had taken oral steroids for an unrelated illness, and thought this may have contributed to her improvement. *Id*. She wanted to avoid a steroid injection because she had to take oral steroids from time to time. *Id*. She was advised to continue PT and work restrictions. *Id*. at 107.

On January 8, 2020, Petitioner returned to occupational health, now reporting a flare up of her shoulder pain, which she now rated five out of ten. Ex. 5 at 112. Her ROM had remained the same, but she had pain with certain movements. *Id*.

3

Petitioner followed up with Dr. Hirani on January 23, 2020. Ex. 7 at 22. She had completed 12 PT sessions and her ROM had improved, but her pain persisted and interfered with her sleep. *Id*. Modified work had been recommended, but her employer was no longer able to accommodate the recommended restrictions, and she had not been working since January 11th. *Id*. On examination, her left shoulder ROM was identical to her right shoulder, and matched the "normal values" used for comparison by Dr. Hirani. *Id*. at 23. However, she continued to have pain with abduction and flexion beyond 90 degrees, and at end ranges of external and internal rotation. *Id*. Dr. Hirani recommended a cortisone injection, but Petitioner declined. *Id*. Petitioner was referred for acupuncture and given topical pain relief treatments. *Id*. Dr. Hirani recommended modified work, with limits on lifting, pushing/pulling, and overhead work. *Id*. at 24. Petitioner reported that she would be on vacation from January 29 to February 27, 2020, and thus would not be able to follow up during that time. *Id*. at 24.

Petitioner returned to occupational health on January 29, 2020. Ex. 5 at 118. She reported that her shoulder pain was the same, and rated it four out of ten. *Id*. Petitioner began acupuncture for left shoulder pain on February 6, 2020. Ex. 9 at 4. She rated her pain between five and ten out of ten. *Id*. Petitioner attended five additional acupuncture sessions between February 8 and March 31, 2020. *Id*. at 5-6.

Petitioner returned to Dr. Hirani on March 2, 2020. Ex. 7 at 19. Acupuncture had helped, although she continued to experience pain, and had difficulty raising her left arm above shoulder level. *Id*. Petitioner was still not working, explaining that her work is physically demanding and she did not feel she was able to return to her regular job yet, and her employer could no longer accommodate modified duty. *Id*. She had full ROM, with pain at end ranges. *Id*. at 20. Dr. Hirani recommended that she continue acupuncture and topical treatments. *Id*.

Petitioner saw Dr. Hirani via telehealth on March 30, 2020. Ex. 7 at 17. Petitioner had continued acupuncture, which had been helpful, and she now had minimal left shoulder pain and no ROM restriction. *Id*. Her symptoms had improved by more than 90%, and she felt she was ready to return to her regular job. *Id*. Dr. Hirani recommended that Petitioner continue acupuncture and return to work starting the following day. *Id*. at 18. At Petitioner's final acupuncture session on March 31st, she reported that her pain had reduced by 90-95%. Ex. 9 at 6.

Petitioner followed up with Dr. Hirani for a telehealth appointment about six weeks later (May 11, 2020). Ex. 7 at 15. She was doing well, although she continued to experience intermittent pain in her left shoulder, especially with exercises and push-ups. *Id*. She had been back at her regular job since March 31st. *Id*. at 16. Petitioner was advised to continue using topical treatments and home exercises. *Id*.

Petitioner returned to her acupuncturist on May 19, 2020. Ex. 9 at 7. She attended five more sessions between June 16 and July 6, 2020. *Id*. at 8-9. At her final session, she

4

had full ROM and described her pain as "very mild and occasional." *Id*. at 9. Her pain was reduced by 90%. *Id*.

Petitioner saw Dr. Hirani by telehealth again on June 22, 2020. Ex. 7 at 13. She was continuing to treat with acupuncture, which was helping. *Id*. She continued to experience occasional shoulder pain. *Id*. She had returned to her usual job duties, and was tolerating this well. *Id*. Dr. Hirani recommended that she continue with two additional acupuncture sessions, as well as topical treatments and home exercises. *Id*. at 14.

Petitioner saw Dr. Hirani by telehealth on August 3, 2020. Ex. 7 at 11. She had completed all recommended sessions of acupuncture, which had been helpful, and was doing well overall. *Id*. She did not report any shoulder pain. *Id*. She continued to do home exercises. *Id*.

Petitioner underwent a final evaluation with Dr. Hirani on August 31, 2020. Ex. 7 at 4. She was not experiencing any symptoms other than an occasional achiness over her left shoulder. *Id*. She continued to do home exercises, and was doing her usual job duties. *Id*. Dr. Hirani considered her to have reached maximum medical improvement. *Id*. Her left shoulder ROM was normal and pain-free. *Id*. at 8. Petitioner was advised to continue with home exercises. *Id*. at 7.

### B. Affidavit

Petitioner filed an affidavit in support of her claim. Ex. 2. She states that she began to experience pain in her left shoulder "[w]ithin a few hours of receiving" the vaccine. *Id*. at ¶ 4. The pain continued to worsen to the point that she could not lift her arm. *Id*.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

To obtain compensation under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are

also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly

recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Parties' Arguments on Onset

Petitioner argues that she continuously and consistently related the onset of her left shoulder pain to her September 2019 vaccination, and thus has established that her pain began within 48 hours thereafter. Petitioner's Motion for Ruling on the Record, filed Sept. 5, 2024, at *9-11 (ECF No. 56) ("Mot."). She first sought care for her injury from her primary care provider just two weeks after vaccination, and reported vaccine-associated symptoms. Mot. at *10. And her records state that the vaccination was deemed by treaters to have likely affected her rotator cuff. *Id*.

Petitioner also reported her injury to her employer's occupational health unit two weeks after vaccination, complaining of pain that began when she received a flu vaccine. Mot. at *10. When she later saw an orthopedist, she reported pain that began within two hours of vaccination. *Id*. at *10-11. And there are no records relating the onset of her shoulder pain to anything other than vaccination. *Id*. at *11.

Respondent argues that Petitioner has not established that her pain began within 48 hours of vaccination. Respondent's Response, filed Oct. 28, 2024, at *11-14 (ECF No. 48) ("Resp."). Respondent acknowledges that Petitioner reported her pain to her physician just two weeks after vaccination, but focuses on communications Petitioner had with medical providers in the interim during which she did not mention shoulder pain. Resp. at *11.

Respondent particularly highlights Petitioner's post-vaccination medical encounter in early October 2019. Resp at *11 (citing Ex. 4 at 2089). Respondent asserts that this record constitutes "*unrefuted* evidence that petitioner underwent a musculoskeletal examination on October 9, 2019, which showed petitioner's left shoulder to be within normal limits – more than forty-eight hours after vaccination." *Id*. (emphasis in original).

### C. Factual Findings on Onset

The record supports a finding that, more likely than not, Petitioner's shoulder pain began within 48 hours after vaccination. Petitioner sought treatment for her shoulder pain just 14 days after vaccination, which does not inherently raise questions about onset. If a petitioner seeks care for other concerns without mentioning shoulder pain in the interim, that *can* cast doubt on whether their shoulder pain existed. But whether an intervening record undermines a favorable onset finding depends on the specific facts and circumstances.

Here, Petitioner exchanged brief electronic messages with her physician confirming that she had gotten a flu vaccine, and asking which pneumococcal vaccine she should receive. Although Petitioner *could* have mentioned her shoulder pain at this time, her failure to do so does not negate the possibility that her pain existed at that time. There are other reasonable explanations for this omission, including that she expected the pain to resolve on its own.

The medical encounter from October 9, 2019, by contrast, presents difficulties for Petitioner's claim. It is true that she received an injection in the affected arm at this time, without complaint of pain (although for a distinguishable condition). Respondent emphasizes that Petitioner "saw her pulmonologist" on this date, but the actual record does not indicate that she saw a physician. And while Respondent asserts that a musculoskeletal examination was performed at this time, my review of the record suggests that this is somewhat of an overstatement. The entirety of the portion of the record Respondent relies on consists of a column with the words "NeuroVasc Musculoskeletal" followed by a column to the right that states "Within Defined Limits" with the initials of the nurse who recorded the information. Ex. 4 at 2089. This is not enough to find that a thorough exam was performed, *and* that no issues were then observed either.

Petitioner first sought care for the alleged injury from her primary care physician just two weeks after vaccination, and five days after the asthma injection. She now unquestionably complained of left arm pain that began two weeks prior after vaccination. Ex. 4 at 2102. On the same day, she reported her injury to her employer's occupational health unit, relating her pain to vaccination. Ex. 5 at 84. The occupational health records list the date of injury as September 30th – the date of vaccination. *Id*. And at her PT evaluation, she related her pain to vaccination. Ex. 8 at 7. And she told her orthopedist that her pain began within two hours of vaccination. Ex. 7 at 25. This evidence in totality supports a Table onset.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 4 at 2064. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Ex. 8 at 7. She received a covered vaccine in the United States. Ex. 3 at 3. She experienced residual effects of her injury for more than six months. Ex. 7 at 15, 17. And she states that she has never received an award or settlement for her vaccine-related injury, nor has she filed a civil action. Ex. 2 at ¶ 6.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III.    Damages

### A.  Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

### B.  Parties' Damages Arguments

Petitioner requests a pain and suffering award of $70,000.00. In support of her proposed award, she cites *Kahler*, *Coli*, *T.E.*, and *Celuch*, all of which involve awards of $70,000.00.[5] Mot. at *13-18. Petitioner asserts that she suffered from a mild to moderate SIRVA, with pain beginning within two hours of vaccination. *Id*. at *15. She sought treatment just two weeks later, and treated with 12 PT sessions, acupuncture, over-the-counter medications, and home exercises. *Id*. at *15-16. She was placed on modified work duty until six months after vaccination. *Id*. at *17.

Respondent argues that Petitioner should be awarded no more than $30,000.00 in pain and suffering damages. Resp. at *14-21. Respondent cites *Valdez* and *McGraw*,

---

[4] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[5] *Kahler. v. Sec'y of Health & Human Servs.*, No. 19-1938V, 2024 WL 1928451 (Fed. Cl. Spec. Mstr. Mar. 27, 2024); *Coli v. Sec'y of Health & Human Servs.*, No. 20-543V, 2022 WL 706682 (Fed. Cl. Spec. Mstr. Feb. 4, 2022); *T.E. v. Sec'y of Health & Human Servs.*, No. 19-633V, 2021 WL 2935751 (Fed. Cl. Spec. Mstr. May 7, 2021); and *Celuch v. Sec'y of Health & Human Servs.*, No. 19-544V, 2021 WL 2368137 (Fed. Cl. Spec. Mstr. May 10, 2021).

where the petitioners were awarded $35,000.00 and $37,500.00, respectively, in support of his proposed award.[6] *Id*. at *19-20.

Respondent argues that Petitioner's injury was mild and limited, and no longer required treatment by nine months after vaccination. Resp. at *16. Within four months of vaccination, her ROM had returned to normal, and by six months her pain had improved by 90-95%. *Id*. (citing Ex. 9 at 6). She was able to do push-ups by eight months after vaccination. *Id*. at *16-17. Respondent argues that her injury lasted "at most eleven months," indicative of "an extremely mild injury" warranting a low award. *Id*. Respondent asserts that the cases Petitioner cites are distinguishable, involving claimants with injuries of longer duration and/or more treatment. *Id*. at *17-18.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner suffered a mild to moderate SIRVA that was painful enough for her to seek care within two weeks of vaccination. She reported pain levels ranging between three and ten out of ten, mostly in the low to moderate range. She reported improvement of 60-85% approximately six weeks after vaccination. By six months, she had full ROM and her pain had improved by 90-95%. At eleven months, she reported no symptoms other than occasional achiness. She treated with PT, acupuncture, and over-the-counter medications. A cortisone injection was recommended, but declined. She was put on restricted work duty, and was off work entirely for a time. By 11 months, she reported only occasional achiness.

Of the cases Petitioner cites, *Coli* is the closest comparison. Both petitioners sought care soon after vaccination, had similar pain ratings, and treated with PT. The *Coli* petitioner treated for longer, with significantly more PT, however. *Valdez* and *McGraw,* by contrast, are not on point. The *Valdez* and *McGraw* claimants, unlike Petitioner, did not initially seek care until approximately two months after vaccination, and did not attend PT. In addition, those petitioners treated for a much shorter period of time.

In light of the record evidence, I find that an award of **$60,000.00** for pain and suffering is appropriate.

### Conclusion

---

[6] *Valdez v. Sec'y of Health & Human Servs.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024); and *McGraw v. Sec'y of Health & Human Servs.*, No. 21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024).

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $60,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[7] Additionally, I find that Petitioner is entitled to **$4,084.33 for lost wages**.[8]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $64,084.33, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[8] The parties agree on this amount. ECF No. 63.

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.